[No. D005452. Fourth Dist., Div. One. Feb. 5, 1988.]

In re the Marriage of GERALDINE ROSE and CHARLES M. HELSEL.
GERALDINE ROSE HELSEL, Respondent, v.
CHARLES M. HELSEL, Appellant.

COUNSEL

William A. Newman III and Cyril Lawrence for Appellant.

Richard D. Ring and Ring & Cline for Respondent.

OPINION

**WIENER, Acting P. J.**—Charles M. Helsel appeals from the order denying his motion to set aside portions of a stipulated judgment. We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1973 an interlocutory judgment dissolved the marriage of Geraldine and Charles Helsel. The judgment awarded custody of the parties' four minor sons to Geraldine and ordered Charles to pay child support of $200 monthly for each child. The judgment also divided the community property, allocated the community debts and provided for attorney's fees. The dissolution did not produce tranquility.

The issue before us was generated by Geraldine's 1985 order to show cause seeking to modify the judgment and to collect accrued child and spousal support. Charles admitted he owed accrued support of about $18,000 but desired a $13,800 setoff for the federal income taxes he paid for the years 1971 and 1972. Charles also wanted the $15,000 held in trust under the judgment of dissolution to be disbursed in a specific fashion.

Geraldine appeared with her counsel at the February 1986 hearing on the order to show cause. Charles, a physician and surgeon, appeared only through his attorney.

The attorneys spent considerable time negotiating a number of points including matters not encompassed within the pleadings. They agreed on some issues and not on others. They decided to orally stipulate to the agreed upon matters and to continue the hearing on the unresolved issues.

Charles's counsel stated he had spoken with his client, who agreed to the stipulation. The court approved the oral stipulation and ordered the hearing continued to May 12, 1986. Geraldine's counsel prepared a written order approved as to form by Charles's counsel. The order was signed and filed on May 5, 1986.[1]

On June 4, 1986, through new counsel Charles moved to set aside parts of the judgment (order) on the ground his attorney was not authorized to stipulate to (1) an increase in child support from $200 to $500 for the parties' youngest son; (2) to pay $750 as attorney's fees to Geraldine's lawyer; and (3) the manner of disbursing the trust fund. Charles's declaration stated his attorney was unauthorized to stipulate to any of the three foregoing items. The court denied the motion, explaining that in family law cases it was essential for both the court and opposing counsel to be able to rely on counsel's apparent authority. The court expressed concern that absent this reliance the family law court's efficient management of its busy order-to-show-cause (OSC) calendar would be substantially impaired. No longer would lawyers be willing to stipulate without receiving absolute assurance that opposing counsel were authorized to enter into every detail of a proposed stipulation. The court would also be obligated to insist on the parties being present in court before accepting a stipulation.[2] This appeal ensued.

---

[1] Section 12 of the order contains what we assume to be a typographical omission when it states: "The obligation of respondent to pay child support to petitioner shall be based upon the following and shall cease if any of the following elements [do not] occur . . . ." (Bracketed language is ours.)

[2] The court's complete statement is as follows: "Because I think higher courts will consider what I am going to say. If you go into any—if you go into any courthouse in any major metropolitan area in the State of California, you will see at least one court like this doing business like this every morning with anywhere from 15 to 30 items on orders to show cause, T.R.O. of a variety of matters, and we manage, through the good work of good dedicated attorneys to secure stipulations in a very large number of cases. Very often we do not require prior signatures of parties to an agreement, relying upon the good faith of counsel. And moreover, we excuse, in effect, busy professionals such as doctors, such as your client, from having to interrupt their schedules and appear in court. They make a decision to rely on their counsel. Your client has gone through a series of counsels.

"Now, and I want this to be very clear to a higher court, if in fact we cannot rely upon the good faith of counsel and assume that they are acting for there [*sic*] clients and have the authority to act for their clients, it puts us in just a difficult situation because it is so easy for parties who have second thoughts—assuming the worst case—of second thoughts to come and say, well, I really didn't give my attorney authority for all of that. Or, on the other hand, even assuming that their [*sic*] correct, it still puts the court in a very difficult position. They chose their attorney. They chose not to be here and it seems to me if they have a lawsuit against their attorney, so be it, but I am not going to disturb this particular stipulation which was worked out, apparently in a, you know, this is getting to be a pretty thick file, worked out over a very lengthy period of time and, counsel, the only thing I can suggest is you take your appeal. I am denying your motion."

## DISCUSSION

In *Blanton* v. *Womancare, Inc.* (1985) 38 Cal.3d 396 [212 Cal.Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109], the California Supreme Court considered the question of the extent to which a lawyer can bind a client to the terms of a stipulation entered into solely by the lawyer without authorization from the client. *Blanton* involved a lawyer's agreement to submit a case to binding arbitration, thereby waiving the client's constitutional right to a trial by jury. **(1)** The Supreme Court recognized the principle that there are some procedural issues in the litigation of a case as to which the lawyer must exercise ultimate authority, even in the face of the client's express objection. As to such issues, the lawyer's authority to bind the client is implied in law. (*Id.* at p. 404.) Although the submission of a dispute to binding arbitration was clearly not such a "procedural" question, the *Blanton* court surveyed the cases which attempt to define this category of issues (e.g., *Linsk* v. *Linsk* (1969) 70 Cal.2d 272 [74 Cal.Rptr. 544, 449 P.2d 760]) and drew on them for assistance in resolving the more difficult question of when the opposing party in litigation can hold the client to a stipulation entered into by the lawyer without the client's authorization but under circumstances in which the opposing party had no reason to believe the lawyer was acting without authorization. *Blanton* then concludes that a lawyer's agreement to submit a case to binding arbitration will not bind the client if the client has not authorized the lawyer to enter into such an agreement.

Conceptually in this area, there are three categories of cases. At one extreme are the cases discussed in *Blanton* in which the lawyer must act as the captain of the litigation ship: "An attorney must be able to make such tactical decisions as whether to call a particular witness, and the court and opposing counsel must be able to rely upon the decisions he makes, even when the client voices opposition in open court. (*Nahhas* v. *Pacific Greyhound Lines, Inc.* (1961) 192 Cal.App.2d 145, 146 [13 Cal.Rptr. 299].) In such tactical matters, it may be said that the attorney's authority is implied in law, as a necessary incident to the function he is engaged to perform." (*Blanton, supra,* 38 Cal.3d at p. 404.) ▇▇▇ At the other end of the spectrum are the cases represented by *Blanton* in which the lawyer's action impairs so substantial a portion of the case or so fundamental a right of the client that it justifies setting aside a stipulation at the expense of an opposing party with no knowledge and/or reason to know of the lawyer's lack of authority.[3] In these cases, "the opposing party must ascertain at his peril

---

[3] We are unaware of any cases which discuss this issue in the context of a situation in which the opposing party has no actual knowledge of the lawyer's lack of authority but was negligent in failing to acquire that knowledge. Principles of equity would appear to be less

whether the attorney has authority to make the settlement." (*Precious* v. *O'Rourke* (1930) 270 Mass. 305 [170 N.E. 110, 111], quoted in *Blanton, supra,* 38 Cal.3d at p. 406.)

■ In between these two extremes lie cases in which the substantive rule is that the lawyer must be authorized by the client to act but in which the nature of the agreement or stipulation is not so substantial that the remedy for breach of the rule should be the setting aside of the agreement. In these cases, the opposing party may continue to enforce the agreement against the client but the client then has recourse against the lawyer for acting in excess of his authority. While it recognizes the issue, *Blanton* does not attempt to define this middle category of cases or even state definitively that such a category exists. (See 38 Cal.3d at pp. 406-407.)

Nevertheless, we reject the suggestion that a client cannot be bound by any unauthorized agreement entered into by a lawyer.[4] Such a rule would effectively require client signature approval for every litigation agreement except those which could be definitively labeled as "tactical" or "procedural" (see *Sanker* v. *Brown* (1985) 167 Cal.App.3d 1144, 1147 [213 Cal.Rptr. 768]), thereby adding tremendous transaction costs to a legal system which has already outpriced a substantial segment of society. Especially considering the fact that the client in any event retains a viable remedy against the lawyer—both in terms of a malpractice suit and State Bar disciplinary action—the benefits of such a rule simply do not outweigh its costs. Moreover, forcing the client to look to the attorney for redress places the burden on the party best able to prevent unauthorized agreements from occurring.

■ *Blanton* of course makes clear that a lawyer has no apparent authority merely by virtue of his status as a retained attorney to waive the client's constitutional right to a jury trial and agree to submit a case to binding arbitration. And because of the cases on which it relied to reach this conclusion (see 38 Cal.3d at p. 406), it is equally clear the *Blanton* court was of the view that a lawyer has no apparent authority to compromise and settle the lawsuit without the client's approval. Beyond that, the Supreme Court appeared to suggest that the mere employment of a lawyer as the attorney of record in pending litigation will not give rise to apparent authority for the lawyer to compromise the client's "substantial rights." (38 Cal.3d at pp. 406-407.)

---

offended in such circumstances if the opposing party were prohibited from enforcing the stipulation.

[4] We assume in this context that actions by a lawyer with respect to "tactical" and/or "procedural" matters—even if objected to by the client—are nonetheless "authorized" because the lawyer has the legal authority to take them and thereby bind the client.

Turning to the facts of this case, it is tempting to treat the stipulation entered into by Charles's counsel as the compromise of his client's case which under the *Blanton* standard clearly cannot bind Charles if he did not authorize the agreement. Our only hesitancy in doing so relates to the fact that *Blanton* and the cases on which it relies represent relatively typical civil litigation fact patterns whereas this case arises in the somewhat unique context of the family law court. As the trial judge here alluded to in his oral ruling denying the motion to set aside the stipulation (*ante,* fn. 1), family law cases may present different issues in this context.

When a lawyer agrees to settle the typical civil case, the case ends as far as the client is concerned. In the typical family law case, however, quite the opposite is true. Frequently at least some issues in family law cases are resolved by way of a stipulation between the parties. As the facts of this case illustrate, most parties can agree on certain matters but leave other matters to be resolved by the court. In the family law context, a stipulation in a given case may be tantamount to settling the entire dispute or may represent merely the flea on the back of the elephant. For example, many stipulations agreeing to dispose of certain issues in a family law case have less an impact on the client's "substantial rights" than the lawyer's "selection of issues to be pursued and the abandonment of those deemed . . . to be untenable . . ." in *Duffy* v. *Griffith* (1962) 206 Cal.App.2d 780, 789 [24 Cal.Rptr. 161], cited with approval in *Linsk* v. *Linsk, supra,* 70 Cal.2d at page 277.

Thus in family law cases where the court is confronted with a motion to set aside a stipulation which disposes of some of the issues in a case on the ground that the lawyer for one of the parties was not authorized to enter into the stipulation, it must determine whether issues disposed of, individually or together, were central to the controversy. If the dispute is substantially resolved by virtue of the stipulation, it is tantamount to the settlement and dismissal of the typical civil case which, under *Blanton,* cannot stand if the client can demonstrate a lack of authorization. On the other hand, if the substantial portion of the case remains to be litigated, the stipulation represents largely a winnowing of the issues so that the dispute is focused for trial. Under such circumstances, we do not believe the system is best served—especially in the often emotionally charged family law environs—if clients may routinely set aside stipulations entered into by their lawyers as to matters which are insubstantial and collateral to the heart of the dispute. In making such a determination, the court may compare the extent to which the stipulation differs from resolution argued by the client to be

justified by the facts. The court may also evaluate the economic value of the stipulation, both in absolute terms and in relation to the total value of the disputed issues in the case.

In the present case, we think it appropriate for several reasons that the trial court make the determination in the first instance whether the stipulation entered into by Charles's counsel substantially resolved the pending controversy between Charles and Geraldine. First, because our familiarity with the case is limited to the appellate record, the trial court is in the best position to understand the relationship of the stipulated issues to those issues which remain unresolved. In addition, the court here has never resolved the factual issue of whether Charles's counsel acted without express or implied authorization.[5] ▮▮▮▮ A hearing on that question would thus be required in any event.[6]

▮ Should the trial court ultimately conclude that the stipulation must be set aside because it substantially resolved the pending dispute between Charles and Geraldine, we think it important to point out that we recognize the process of arriving at a stipulation consists largely of give-and-take negotiation. Relinquishing a strong position on one issue is sometimes given in exchange for receiving a benefit on another. Thus here, in deciding whether to set aside parts of the stipulated order the court can properly consider whether fairness requires relieving Geraldine from other parts of the stipulation.[7]

---

[5] The record here suggests the resolution of that issue will turn on whether, as represented by Charles's lawyer in court, Charles was informed of the stipulation by phone and expressly agreed to its terms. (*Ante,* p. 335) Under other circumstances, of course, an opposing party might argue that the objecting client *impliedly* authorized his lawyer to enter into a stipulation (see *Edwards* v. *Born, Inc.* (3d Cir. 1986) 792 F.2d 387, 391) or by words or conduct created *apparent* authority by causing the opposing party to reasonably believe the lawyer was authorized to stipulate (see *Blanton, supra,* 38 Cal.3d at p. 406).

[6] We reject Geraldine's assertion that we can conclude as a matter of law Charles authorized his lawyer to act because Charles made two support payments pursuant to the modified order. Since Charles explained that his compliance with the order was to avoid a possible contempt finding, we cannot say that his brief compliance necessarily compels the conclusion that his lawyer was authorized to stipulate. Moreover, Charles acted promptly. He discharged his former counsel, obtained new counsel, and brought the underlying motion within 30 days of the stipulation.

[7] In addition, the administrative disruption with which the trial court was concerned can be minimized by the court's thoughtful exercise of power under Code of Civil Procedure section 473. That section expressly provides that the court can set aside a judgment on "such terms as may be proper." At oral argument we asked Charles's appellate counsel what was proper here, suggesting that Charles should be obligated to pay the attorney's fees incurred by Geraldine for the unnecessary time devoted to negotiating the stipulation and at the hearing to resist the motion. Charles's decision to forego appearing at the initial OSC hearing was at least a concurring cause for these subsequent proceedings. Appellate counsel agreed, and we

## Disposition

Order reversed for further proceedings consistent with this opinion. Charles Helsel to bear all costs for this appeal.

Work, J., and Todd, J., concurred.

---

think properly so, that if Charles succeeds in his motion, the trial court can order him to pay a reasonable sum as a condition of the court setting aside the stipulation.